## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

**BONITA PAYNE,**              )
    Plaintiff              )
                      )
v.              )   Civil Action No. 2:13cv00042
                      )
**CAROLYN W. COLVIN,**              )   **MEMORANDUM OPINION**
  **Acting Commissioner of**              )
  **Social Security,**              )
    Defendant              )   BY: PAMELA MEADE SARGENT
                      )   United States Magistrate Judge

### I.  Background and Standard of Review

Plaintiff, Bonita Payne, ("Payne"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Payne protectively filed an application[1] for DIB on November 20, 2008, alleging disability as of August 15, 2006, due to arthritis in the back, hips and hands, depression and anxiety.[2] (R. at 351-54, 376, 381, 400, 448.) The claim was denied initially and on reconsideration. (R. at 297-99, 303, 304-06.) Payne then requested a hearing before an administrative law judge, ("ALJ"), (R. at 308-09.) The hearing was held on February 3, 2011, at which Payne was represented by counsel. (R. at 207-32.)

By decision dated March 9, 2011, the ALJ denied Payne's claim. (R. at 188-200.) The ALJ found that Payne met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2010. (R. at 190.) The ALJ also found that Payne had not engaged in substantial gainful activity during the

---

[1] Payne filed a prior application for DIB alleging disability as of August 15, 2006. (R. at 248.) By decision dated November 17, 2008, the claim was denied. (R. at 248-58.) The Appeals Council denied review, and this court later affirmed the decision denying benefits in an opinion dated October 19, 2011. *See Payne v. Astrue*, No. 2:10cv00071 (Docket Item No. 16).

[2] Because Payne filed a prior application for DIB, which was denied by decision dated November 17, 2008, this prior decision is res judicata. That being the case, the question before the court is whether Payne was disabled at any time between November 18, 2008, the date following the ALJ's prior denial, and September 30, 2010, Payne's date last insured. Any facts included in this Memorandum Opinion not directly related to this time period are included for clarity of the record.

Case 2:13-cv-00042-PMS   Document 20   Filed 01/09/15   Page 2 of 24   Pageid#: 842

period from her alleged onset date of August 15, 2006, through her date last insured of September 30, 2010. (R. at 190.) The ALJ found that the medical evidence established that, through the date last insured, Payne suffered from severe impairments, namely mild degenerative disc disease of the lumbar spine with lordosis and SI joint dysfunction; right arm tenosynovitis; history of asthma; dysthymic disorder; and post-traumatic stress disorder, ("PTSD"), but he found that Payne did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 190-92.) The ALJ found that Payne had the residual functional capacity to perform a range of sedentary work,[3] which did not require her to stand and/or walk for a total of more than two hours in an eight-hour workday and which did not require her to stand and/or walk for more than 20 minutes at a time. (R. at 192.) The ALJ also found that Payne could frequently, but not constantly, use her right, dominant hand for handling or fingering objects, but he found that she could rarely climb, kneel or operate foot controls and never crouch or crawl. (R. at 192-93.) The ALJ found that Payne must avoid concentrated exposure to pulmonary irritants (dusts, odors and fumes), humidity, wetness and extreme temperatures. (R. at 192.) Finally, the ALJ found that Payne could maintain attention and concentration long enough to perform routine and repetitive tasks involving short and simple instructions and could occasionally interact with others in the work environment, but would need to avoid large crowds. (R. at 193.) The ALJ found that Payne was unable to perform any of her past relevant work. (R. at 198.) Based on Payne's age,

---

[3] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2014).

-3-

education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that jobs existed in significant numbers in the national economy that Payne could perform, including jobs as a general production worker, a material handler and a telephone order clerk. (R. at 199.) Thus, the ALJ found that Payne was not under a disability as defined under the Act from August 15, 2006, the alleged onset date, through September 30, 2010, the date last insured, and was not eligible for benefits. (R. at 200.) *See* 20 C.F.R. § 404.1520(g) (2014).

After the ALJ issued his decision, Payne pursued her administrative appeals, (R. at 184), but the Appeals Council denied her request for review. (R. at 1-6.) Payne then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2014). The case is before this court on Payne's motion for summary judgment filed February 26, 2014, and the Commissioner's motion for summary judgment filed March 31, 2014.

## II. Facts[4]

Payne was born in 1971, (R. at 351), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). She has a high school education and past relevant work experience as a motel housekeeper, a cashier and a sales associate in retail sales and a fast food worker. (R. at 212, 392-93, 401.)

---

[4] Payne argues on appeal only that the ALJ erred with regard to her mental residual functional capacity finding. Therefore, the facts contained herein are limited to those relevant to Payne's mental impairments and limitations.

Payne testified that dealing with the public and with large numbers of people made her nervous and very uncomfortable. (R. at 213.) She testified that she was receiving counseling from Kaye Weitzman, which she felt was beneficial. (R. at 217-18.) However, Payne stated that she had not taken any medications for her mental health issues for at least a year because she did not like the side effect of fatigue. (R. at 218.) She stated that she lived with her five-year-old son and her boyfriend. (R. at 218.) Payne testified that she was responsible for getting her son up and making sure he got dressed for school and had breakfast, but that her boyfriend drove him to school. (R. at 218-19.) She stated that she played board games with her son. (R. at 219.) Payne testified that she "very rarely" left her house for any reason other than to go to counseling or medical appointments because of her dislike of crowds, as well as allergies and asthma. (R. at 219.) She stated that her boyfriend paid the household bills. (R. at 220.) Payne testified that she tried to do light duty housework, such as laundry and dusting, and that she liked to read. (R. at 220-21.) She also stated that she liked to garden and play ball with her son during warmer weather when she felt like it. (R. at 220.)

Payne testified that she had crying spells and panic attacks between three to five times monthly and had difficulty remembering and concentrating. (R. at 223.) She stated that she and her mental health care provider had not discussed any future plans regarding her mental health, such as trying other mental health medications. (R. at 223-24.) Payne testified that she had noticed an increase in her problems since being off of her medications. (R. at 224.)

Robert Jackson, a vocational expert, also was present and testified at Payne's hearing. (R. at 225-30.) Jackson classified Payne's past work as a fast food

-5-

worker, a cashier and a motel housekeeper as light[5] and unskilled and as a retail sales clerk as light and semi-skilled. (R. at 226.) Jackson testified that if an individual needed to miss two days of work monthly, that would not be consistent with the competitive workplace. (R. at 227.) The ALJ stipulated that, if he were to find that the mental assessment completed by Weitzman on July 15, 2010, was supported by the other evidence of record, such an individual would not be able to perform competitive work. (R. at 227.) Jackson testified that a hypothetical individual of Payne's age, education and work history, who could perform routine, repetitive sedentary work that required no more than frequent use of the right dominant hand for handling or fingering, who could rarely operate foot controls, who could rarely climb, who could rarely kneel, who could never crouch or crawl, who would need to avoid concentrated exposure to pulmonary irritants such as dust, odors and fumes, as well as concentrated exposure to humidity and wetness and temperature extremes, and who could interact appropriately with others in the work environment on at least an occasional basis, but would need to avoid large crowds, could not perform any of Payne's past work, but could perform other jobs existing in significant numbers in the national economy, such as a general production worker, a material handler and a telephone order clerk. (R. at 227-29.) Jackson next testified that the same hypothetical individual, but who could stand and/or walk for no more than 20 minutes at a time, could perform the jobs previously enumerated. (R. at 230.) However, Jackson testified that the same hypothetical individual, but who was limited to no more than occasional handling and fingering with the right dominant hand, could perform no sedentary

---

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2014).

employment.  (R. at 230.)

In rendering his decision, the ALJ reviewed medical records from Norton Community Hospital; Bon Secours St. Mary's Hospital; Appalachia Family Health Center; Park Avenue Physical Therapy & Sports Clinic; Michael R. Williams, L.C.S.W.; Abingdon Psychological Services; Ralph Ramsden, Ph.D., a licensed clinical psychologist; Wise Medical Group; Medical Associates of Southwest Virginia; Solutions Counseling; Southwest Virginia Specialty Clinic; Appalachian Psychological Consultants; Edward Trent, M.P.T.; Dr. Christopher Basham, M.D.; Dr. Mark Russ, M.D.; D. Kaye Weitzman, L.C.S.W.; Mountain View Regional Medical Center; East Kentucky Physical Therapy; Dr. James W. Campbell, D.O.; and Dr. Esther Adade, M.D.  Payne's attorney submitted additional medical records from Lab Corp; East Kentucky Physical Therapy; The Regional Eye Center; Wise Cavalier Clinic; Lonesome Pine Hospital; Arthritis Associates; Abingdon Ear, Nose & Throat; D. Kaye Weitzman; Medical Associates; Medical Associates of Norton; Mountain View Regional Medical Center; and Arthritis Associates of Kingsport to the Appeals Council.[6]

On December 31, 2008, Payne saw Robert Spangler, Ph.D., a licensed clinical psychologist, for a consultative psychological evaluation at the request of her attorney.  (R. at 636-41.) Spangler noted that she was appropriately dressed, cooperative and medicated. (R. at 636.) Her general activity level was slow, but she seemed socially confident, although anxious and depressed. (R. at 636.) Payne

---

[6] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take it into account when determining whether substantial evidence supports the ALJ's findings.  *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

had a sad appearance. (R. at 636.) She generally understood the directions for each task, but demonstrated erratic concentration secondary to discomfort and anxiety. (R. at 636.) Payne was appropriately persistent on tasks, but her pace was impacted by erratic concentration. (R. at 636.) She reported that her mental problems began at the age of approximately 23. (R. at 637.) Payne reported being in an abusive marriage while still in high school, which resulted in continued nightmares and "flashbacks." (R. at 637.) She reported frequent anxiety and panic attacks, usually accompanying the nightmares and flashbacks. (R. at 637.) Payne stated that she began counseling in 2007 for PTSD and abuse, but stopped in 2008 due to the closing of her counselor's practice. (R. at 637.) She stated that she was awaiting a referral to another counselor. (R. at 637.) Payne stated that her primary care physician was treating her anxiety in the meantime. (R. at 637.) However, she admitted no mental health treatment since her counselor closed his practice in September 2008. (R. at 637.) Spangler opined that Payne's mental health condition was progressive. (R. at 637.)

Payne stated that she graduated from high school, but failed two grades in elementary school. (R. at 638.) She took special education reading and math classes throughout high school. (R. at 638.) Spangler noted that objective achievement data refute a regular education diploma. (R. at 638.) Payne was alert and fully oriented with adequate recall of remote and recent events. (R. at 638.) Payne exhibited good eye contact, her affect was appropriate, and her mood was anxious and depressed, but she was cooperative, compliant and forthcoming. (R. at 638.) Her judgment and insight were consistent with low average intelligence. (R. at 638.) Stream of thought was goal oriented, associations were logical, and thought content was nonpsychotic. (R. at 638.) No perceptual abnormalities were

-8-

noted. (R. at 638.) Payne appeared to be functioning in the low average range of intelligence and was emotionally labile secondary to environmental stimulus and nightmares. (R. at 638.) She denied suicidal and homicidal ideations, and delusional thoughts were not evident. (R. at 638.) Spangler deemed her credible. (R. at 638.) Payne reported getting up at 5:00 a.m., preparing microwave meals daily, doing laundry weekly with help, watching television and going to bed around 10:00 p.m. (R. at 639.) She stated that on a "bad day," she could not take care of her son, while, on a "good day," she could visit the park. (R. at 639.) Spangler assessed Payne's social skills as adequate, and he noted that she related well to him. (R. at 639.)

Spangler administered psychological testing, including the Wechsler Adult Intelligence Scale–Fourth Edition, ("WAIS-IV"), and the Wide Range Achievement Test–Fourth Edition, ("WRAT-4"). (R. at 639-40.) Payne achieved a full-scale IQ score of 83, placing her in the low average range of intelligence. (R. at 640.) Spangler noted that the WRAT-4 results were consistent with the WAIS-IV results and that she achieved a word reading score at the 5.4 grade level, a sentence comprehension score at the 8.1 grade level and an arithmetic computation score at the 4.8 level. (R. at 640.) Spangler noted a history of dysthymic disorder, spousal abuse, nightmares and flashbacks, as well as major depression and panic disorder without agoraphobia and rule out PTSD. (R. at 641.) He diagnosed moderate to severe PTSD; chronic, mild to moderate, early onset dysthymic disorder; low average intelligence; marginal education reading skills; marginal education math skills; limited education reading comprehension skills; mild erratic concentration; slow pace secondary to medical conditions; and he assessed her

-9-

then-current Global Assessment of Functioning, ("GAF"),[7] score at 50 to 55[8]. (R. at 641.) Spangler opined that Payne's prognosis was guarded, noting that she needed regular mental health treatment for an extended period of time to exceed 12 months. (R. at 641.)

Spangler also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental), finding that Payne had a limited, but satisfactory, ability to follow simple work rules, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 642-45.) He found that she had between a limited, but satisfactory, ability and a seriously limited ability to use judgment, to function independently and to maintain attention and concentration. (R. at 643.) Spangler found that Payne had a seriously limited ability to relate to co-workers, to interact with supervisors, to understand, remember and carry out detailed job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 643-44.) He found that she had between a seriously limited ability and no ability to deal with the public. (R. at 643.) Spangler found that Payne had no ability to deal with work stress and to understand, remember and carry out complex job instructions. (R. at 643-44.) Spangler found that Payne would be absent from work about two days monthly due to her impairments or treatment.

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

(R. at 645.) He stated that he was basing his findings on Payne's moderate to severe PTSD; mild to moderate dysthymic disorder; mild erratic concentration; her limited to marginal educational skills in reading and math; a slow pace secondary to medical conditions; and the effect of fatigue on reliability. (R. at 643-44.) Spangler also stated that all work-related activities would be impacted by Payne's moderate to severe anxiety and mild to moderate depressive symptoms, and he noted that Payne's weak academic skills restricted her to simple jobs across her residual functional capacity if, and when, she was released from mental health treatment. (R. at 645.)

Payne was seen at Southwest Virginia Specialty Clinic on four occasions from February 18, 2009, through July 6, 2009. (R. at 654, 656, 658, 664.) She did not voice any mental health complaints at any of these visits.

Howard Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on May 11, 2009. (R. at 267-68.) He opined that Payne was mildly restricted in her activities of daily living, experienced mild difficulties in maintaining social functioning, experienced moderate difficulties in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 268.) Leizer also completed a Mental Residual Functional Capacity Assessment, finding that Payne's ability to understand and remember very short and simple instructions was moderately limited, as was her ability to understand, remember and carry out detailed instructions. (R. at 272-74.) He attributed these limitations to her low average IQ and erratic concentration. (R. at 273.) Leizer further opined that Payne's abilities to maintain attention and concentration for extended periods and

-11-

to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods were moderately limited. (R. at 273-74.) Leizer opined that these sustained concentration and persistence limitations were due to Payne's mood disorder with major depressive like episodes and her anxiety disorder with both generalized anxiety and panic attacks. (R. at 274.) He further opined that Payne did not have social interaction limitations or adaptation limitations and that her abilities to remember locations and work-like procedures, to carry out very short and simple instructions, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them and to make simple work-related decisions were not significantly limited. (R. at 273-74.)

Dr. Thomas Phillips, M.D., a state agency physician, concluded, among other things, that, while the evidence showed that Payne had been treated for anxiety and depression, which affected her ability to perform some activities, she should be able to take care of personal needs, understand and follow simple directions and perform simple, routine work. (R. at 276.)

On June 9, 2009, Payne saw Dr. Christopher M. Basham, M.D., with Medical Associates of Southwest Virginia. (R. at 671.) She had no mental health complaints at that time. (R. at 671.) On July 6, 2009, Payne was seen by Dr. Sam G. Vorkpor, M.D., again voicing no mental health complaints. (R. at 670.) She returned to Dr. Basham on August 11, and October 12, 2009, and had no mental health complaints at either visit. (R. at 669, 689.)

-12-

Payne saw Dr. Mark D. Russ, M.D., on October 20, 2009, with complaints of right thumb pain. (R. at 697-98.) Dr. Russ noted that she was in no apparent distress, fully oriented and had an appropriate mood and affect to the situation. (R. at 697.) She saw Dr. Russ again on December 1, 2009, for complaints of right thumb tenosynovitis. (R. at 696.) Dr. Russ again noted that she was oriented to person, place and time, and her mood and affect were normal and appropriate to the situation. (R. at 696.)

Joseph Leizer, Ph.D., a state agency psychologist, completed another PRTF on October 14, 2009, finding that Payne was mildly restricted in her activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence and pace and had experienced no episodes of decompensation of extended duration. (R. at 285-86.) Leizer noted that, while the medical evidence documented anxious and depressive symptoms, there were no disturbances in reality contact and no psychotic symptoms. (R. at 286.) He further noted that Payne had low average intelligence and adaptive functioning that was not significantly limited. (R. at 286.) For these reasons, Leizer concluded that Payne was able to perform the mental requirements of at least simple, unskilled and nonstressful work. (R. at 286.) Leizer also completed a Mental Residual Functional Capacity Assessment, finding that Payne was moderately limited in her ability to understand and remember both very short and simple instructions, as well as detailed instructions. (R. at 289-90.) He explained this finding was based on Payne's anxiety and depression, as well as limited basic academic skills. (R. at 289.) He also found that she was moderately limited in her abilities to carry out detailed instructions, to maintain attention and concentration for extended periods and to complete a normal workday and workweek without

-13-

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 289.) Leizer also based these limitations on Payne's anxiety and depression, as well as limited basic academic skills. (R. at 290.) He opined that Payne was moderately limited in her ability to interact appropriately with the general public. (R. at 290.) He found that Payne had no adaptation limitations. (R. at 290.) In all other areas, Leizer opined that Payne was not significantly limited. (R. at 289-90.)

On October 15, 2009, Payne saw Dr. Sai P. Gutti, M.D., a pain management specialist. (R. at 707-08.) Dr. Gutti noted that Payne was depressed, and he diagnosed her with, among many other things, reactive depression. (R. at 708.) Payne saw Dr. Gutti on four occasions from November 17, 2009, through March 23, 2010. (R. at 700-01, 703, 705.) During these visits, Payne was alert with normal speech. (R. at 700-01, 703, 705.)

Payne began seeing D. Kaye Weitzman, L.C.S.W., a licensed clinical social worker, on December 1, 2009, for counseling. (R. at 712.) Payne reported life stresses, but denied suicidal or homicidal ideations. (R. at 712.) She reported that the stress made her depressed, cry and angry. (R. at 712.) She reported panic attacks, triggered by bad dreams. (R. at 712.) She further endorsed relationship problems. (R. at 712.) Mental status examination revealed that Payne had a depressed and irritable mood with an anxious and angry affect. (R. at 712.) She had intact orientation, racing thought process, transient paranoia/delusions and fair insight and judgment. (R. at 712.) Weitzman diagnosed moderate, recurrent major depressive disorder; mood disorder; and generalized anxiety disorder. (R. at 712.)

-14-

Weitzman assessed Payne's then-current GAF score at 65,[9] and she recommended individual cognitive therapy sessions every two weeks. (R. at 712.)

On March 11, 2010, Payne saw Dr. James Wesley Campbell, D.O., to establish care as a new patient. (R. at 760-62.) Payne was alert and fully oriented with no focal deficits. (R. at 761.) When she returned to Dr. Campbell on April 12, 2010, he again noted that she was alert and fully oriented with no focal deficits. (R. at 758.)

On April 25, 2010, Payne returned to Weitzman, reporting that she was very irritated due to her worsened physical condition. (R. at 711.) She reported that her pain depressed and aggravated her. (R. at 711.) Payne stated that she was moderately depressed and anxious, moderately irritable/angry and experienced moderate panic attacks, but only mild crying spells. (R. at 711.) She further reported decreased energy, appetite and sleep. (R. at 711.) Payne denied suicidal or homicidal ideations. (R. at 711.) On mental status examination, Weitzman noted that Payne had a depressed and irritable mood with an anxious and angry, but appropriate, affect. (R. at 711.) Her orientation and thought process were intact, judgment and insight were fair, and she had transient paranoia/delusions. (R. at 711.) Weitzman again diagnosed mood disorder; generalized anxiety disorder; and moderate, recurrent major depressive disorder. (R. at 711.) On June 4, 2010, Payne continued to complain of physical ailments. (R. at 710.) She reported moderate depression and anxiety, as well as moderate irritability/anger, crying spells and

_____

[9] A GAF score of 61 to 70 indicates "[s]ome mild symptoms … OR some difficulty in social, occupational, or school functioning … but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

-15-

panic attacks. (R. at 710.) Payne complained of decreased energy, appetite and sleep, but she continued to deny suicidal or homicidal ideations. (R. at 710.) On mental status examination, Weitzman found Payne had a depressed and irritable mood with an anxious and angry, but appropriate, affect. (R. at 710.) Her orientation and thought process were intact, judgment and insight were fair, but she had transient paranoia/delusions. (R. at 710.) Weitzman noted only minimal progress. (R. at 710.) She diagnosed mood disorder; and generalized anxiety disorder. (R. at 710.) Payne requested a letter "To Whom It May Concern," stating that she suffered from back pain, that she needed nerve medications and that she was not a malingerer. (R. at 710.)

On May 24, 2010, Payne returned to Dr. Campbell for follow-up on her physical ailments, including hypothyroidism, chronic low back pain and asthma. (R. at 755-56.) Dr. Campbell noted that Payne was alert, fully oriented with no focal deficits and in no acute distress. (R. at 755-56.)

Payne presented to the emergency department at Mountain View Regional Medical Center on July 7, 2010, with complaints of cough, chest pain, an upper respiratory infection and sinus pressure. (R. at 714-21.) She was alert and in no acute distress. (R. at 715.) She voiced no mental health complaints. (R. at 714-21.) It was noted that Payne demonstrated normal behavior appropriate for her age and the situation. (R. at 718.) Payne reported that she could ambulate independently and could perform all activities of daily living without assistance. (R. at 718.) She exhibited the ability and willingness to learn. (R. at 718.)

On July 15, 2010, Weitzman completed a Medical Assessment Of Ability To

Do Work-Related Activities (Mental) of Payne, finding that she had a seriously limited ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to function independently, to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 738-40.) Weitzman found that Payne had no useful ability to interact with supervisors, to deal with work stresses, to maintain attention and concentration and to understand, remember and carry out both detailed and complex job instructions. (R. at 738-39.) Weitzman opined that Payne would miss more than two days of work monthly due to her impairments or treatment. (R. at 740.) Weitzman failed to state any medical/clinical findings to support her findings or to elaborate on the reasoning behind her findings. (R. at 738-40.)

Payne saw Dr. Esther Adade, M.D., from June 21, 2010, through January 28, 2011, for her physical complaints.[10] (R. at 769-75.) These treatment notes consistently reveal that Payne's affect was normal. (R. at 769-75.)

When Payne returned to Weitzman on January 31, 2011, she complained of moderate depression, anxiety, irritability/anger, crying spells and panic attacks. (R. at 764.) She also complained of decreased energy, appetite and sleep. (R. at 764.) Payne reported no suicidal or homicidal ideations. (R. at 764.) On mental status examination, Weitzman found Payne's mood to be depressed and irritable with an anxious affect. (R. at 764.) Her orientation and thought process were intact, judgment/insight was fair, and she had no paranoia/delusions. (R. at 764.)

---

[10] Dr. Adade's handwritten treatment notes of Payne are largely illegible. However, it is clear that they relate mostly to Payne's physical ailments.

-17-

Weitzman noted that Payne had flashbacks from an abusive marriage. (R. at 764.) Weitzman added PTSD to Payne's diagnoses. (R. at 764.) She also diagnosed mood disorder; generalized anxiety disorder; and moderate, recurrent major depressive disorder. (R. at 764.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2014); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2014).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

Payne argues that the ALJ erred by improperly determining her mental residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-9.) More specifically, Payne argues that the ALJ erred by giving little weight to the opinions of Williams, Weitzman, Ramsden and Spangler. As noted above, Payne does not challenge the ALJ's finding as to her physical impairments or her physical residual functional capacity.

After a review of the evidence of record, I find Payne's argument unpersuasive. At the outset, the court recognizes that the opinions of social worker Williams and psychologist Ramsden were from a time period prior to that which is relevant to the court's decision. That being the case, those opinions will not be discussed. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ must generally give more weight to the opinion of a

treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 406.1527(c)(2) (2014). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's decision to not give controlling weight to the opinions of either Weitzman or Spangler. I first note that, although Weitzman counseled Payne, she is not considered an "acceptable medical source" under the Social Security Regulations and, therefore, may not be considered a treating source. Pursuant to 20 C.F.R. § 404.1513(a), only an "acceptable medical source" can establish the existence of a medically determinable impairment. Weitzman is a licensed clinical social worker who is not classified as an "acceptable medical source" under 20 C.F.R. § 404.1513(a). However, she is considered an "other source" who may provide evidence to show the severity of a claimant's impairments and how it affects her ability to work. *See* 20 C.F.R. § 404.1513(d) (2014). Only acceptable medical sources can offer a medical opinion. *See* S.S.R. 06-0p, WEST'S SOCIAL SECURITY REPORTING SERVICE, (West Supp. 2013). Furthermore, only acceptable medical sources may be considered "treating sources" as defined under the Regulations. Therefore, an opinion of an "other source" is never entitled to controlling weight.

-20-

The record shows that, during the period of time relevant to the disability determination at issue, Payne saw Weitzman for counseling from December 1, 2009, through January 31, 2011. Over this time, Weitzman diagnosed Payne with moderate, recurrent major depressive disorder; generalized anxiety disorder; mood disorder; and PTSD. While Weitzman found that Payne was depressed and irritable with an anxious and angry affect, and she further noted twice that Payne had transient paranoia/delusions, Weitzman deemed her orientation and thought processes to be intact and her judgment and insight to be fair. In December 2009, Weitzman assigned Payne a GAF score of 65, indicating only mild symptoms. Weitzman's July 15, 2010, mental assessment of Payne, finding, among other things, that she had no useful ability to interact with supervisors, to deal with work stresses, to maintain attention and concentration and to understand, remember and carry out both detailed and complex job instructions and that her impairments would cause her to miss more than two workdays monthly, is not supported by her own treatment notes. Additionally, Weitzman failed to support her opinions or to elaborate on the reasoning therefor.

Furthermore, treatment notes from other medical sources during the same time Payne was treated by Weitzman do not support Weitzman's mental assessment. In March and April 2011, Dr. Campbell noted that Payne was fully oriented with no focal deficits. In May 2010, Dr. Campbell noted that she was alert, fully oriented with no focal deficits and in no acute distress. In July 2010, Payne voiced no mental health complaints during an emergency department visit. She was alert and demonstrated normal behavior, appropriate for her age and the situation. Payne reported that she could perform all activities of daily living independently. During her treatment with Dr. Adade, from June 2010 through

January 2011, Payne's affect was normal.

For all of these reasons, I find that substantial evidence supports the ALJ's decision to accord little weight to the July 2010 mental assessment completed by Weitzman. I also find, for the same reasons, and for the reasons that follow, that the ALJ did not err in according little weight to the opinion of psychologist Spangler.

Psychologist Spangler, an "acceptable medical source," opined, among other things, that Payne had a seriously limited ability to relate to co-workers, to interact with supervisors, to understand, remember and carry out detailed job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. He further opined that Payne had no useful ability to deal with work stress and to understand, remember and carry out complex job instructions. Spangler opined that Payne would be absent from work about two days monthly due to her impairments. He based these opinions on Payne's diagnoses of PTSD; dysthymic disorder; mild erratic concentration; her limited to marginal educational skills in reading and math; a slow pace secondary to medical conditions; and the effect of fatigue on reliability. Spangler further noted that all work-related activities would be impacted by Payne's anxiety and depressive symptoms, and he found that her weak academic skills restricted her to simple jobs.

I first note that Spangler's opinions that Payne was quite limited with regard to her work-related mental abilities are not completely consistent with his narrative report. For instance, in his report, he stated that Payne maintained good eye

contact, had an appropriate affect, was compliant, cooperative and forthcoming, and she appeared to be socially confident. This is in direct contradiction to his opinion that she had a seriously limited ability to relate to co-workers, to interact with supervisors and, arguably, to relate predictably in social situations and to behave in an emotionally stable manner. From Spangler's narrative report, it appears that Payne was able to relate well to the examiner and exhibited no behavior that raised enough concern for Spangler to document the same with regard to such ability. Additionally, there are no treatment notes in the record to substantiate any allegation that Payne did not relate well to others. Moreover, as stated above, treatment notes reflected consistently that she was oriented and alert with no focal deficits, and she failed to voice any mental health concerns during various medical appointments throughout the relevant time period.  She even reported that she could perform all activities of daily living independently. Furthermore, Payne testified that she had not taken any psychotropic medications for at least one year prior to her hearing, and the record shows that she attended only four counseling sessions during the time period relevant to this court's decision.  Interestingly, Payne testified that counseling was beneficial to her, and she stated that her symptoms worsened when she stopped taking her medication. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). The court notes that Payne also never has been hospitalized or treated inpatient for her mental impairments.  I find that all of these facts cut against the harsh restrictions imposed by both Weitzman and Spangler, and it is for all of these reasons that I find that substantial evidence supports the ALJ's decision to accord little weight to both Weitzman's and Spangler's opinions.

-23-

While Payne also argues that the ALJ erred by formulating his own residual functional capacity finding instead of adopting one as found by a mental health source, I disagree. As the Commissioner notes in her brief, it is solely the responsibility of the ALJ to determine residual functional capacity at the hearing level. *See* 20 C.F.R. § 404.1546(c) (2014). The ALJ is not bound to accept, in whole, a residual functional capacity assessment of a claimant as found by a mental health source. Instead, taking the evidence of record in total, the ALJ may craft an appropriate residual functional capacity finding. Based on all of the evidence set forth herein, and for the reasons stated above, I find that is what the ALJ did in his case.

For all of the reasons stated herein, I find that substantial evidence supports the ALJ's decision to accord little weight to the opinions of Weitzman and Spangler. I further find that substantial evidence supports the ALJ's finding as to Payne's mental residual functional capacity and his finding that she was not disabled. An appropriate order and judgment will be entered.

ENTERED: January 9, 2015.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE